Halsey v. Gaines.

THE STATE ex rel. IRVING HALSEY v. JAMES L. GAINES, Comptroller.

JUDGE. *Salary. When not entitled to.* A Judge whose courts have been abolished by the Legislature, ceases to be a Judge of the State, and is not thereafter entitled to his salary for the balance of his term of office so abolished.

FROM SHELBY.

Appeal in error from the Circuit Court of Shelby county. J. O. PEARCE, J.

METCALF & WALKER and TAYLOR & CARROLL for Halsey.

ATTORNEY-GENERAL LEA for Comptroller.

MCFARLAND, J., delivered the opinion of the court.

The relator was Judge of the Second Circuit Court of Shelby county, his term of office extending by the constitution until the 1st of September, 1878. Before this time, to-wit, on the 15th of March, 1875, the Legislature passed an act abolishing the court from and after the 3d Monday of September, 1875. The validity of this act was contested, and it was contended that the Legislature had no power under the constitution to abolish the court; but upon full argument and consideration, the majority of this court held differently. The act was adjudged to be constitutional and valid, and the court ceased to exist. The opinion of the late Chief Justice Nicholson, in which all the other

Halsey v. Gaines.

members of the court, except Judge Freeman, concur, shows the grounds upon which this conclusion was reached. See *The State ex rel. Coleman* v. *Campbell*, MS.

The relator has since applied to the Comptroller for a warrant for his salary, insisting upon his right to have the same paid until the end of his term, (September, 1878) notwithstanding court has been abolished. The warrant was refused, when the present petition for *mandamus* was presented to the Judge of the Circuit Court of Shelby county. The writ was granted and made peremptory. The Comptroller has appealed.

Much of the argument which has been pressed upon us in support of the claims, assumes that the former rulings of this court, as to the validity of the act abolishing the court, is erroneous. If this could be maintained, it could not change the effect of the adjudication. The act was solemnly and in terms adjudged constitutional. A peremptory *mandamus* was awarded to carry the act into effect, by transferring the record to the remaining circuit clerk, and the court ceased to exist. It is true the relator was not a party to these proceedings, nor was he a necessary party.

The adjudication is, nevertheless, conclusive, and whatever judgment may be rendered, it is certain that the court in law and fact ceased to exist on and after the 3d Monday in September, 1875, by the judgment of this court, which cannot now be reversed. So that the relator is in the attitude of claiming a salary as Judge of the Second Circuit Court of Shelby county during a period of time when no such court existed, either in law or in fact.

Halsey *v.* Gaines.

In this view it would seem to be unnecessary to re-examine the grounds of our former decision, but entertaining as we do, no doubt of its correctness, we produce briefly the substance of the reasoning of Chief Justice Nicholson, to which we can add but little.

We believe it is not denied that previous to the constitution of 1870, the Legislature did possess the power to abolish circuit and chancery courts at pleasure. In fact the very court in question was created by an act of the 4th of December, 1869, which abolished the system of courts previously existing in Shelby county, and established instead two circuit courts, two chancery courts, and one criminal court, one of the circuit courts being the one now in controversy. With the abolition of the existing courts, the judges thereof were displaced and new judges elected to fill the new courts created by the act.

The validity of this act was recognized by the convention of 1870, and the courts continued to exist until one of them were abolished by the act of 1875, before referred to. This was by no means the only instance in which the Legislature exercised the power of establishing and abolishing courts as the public necessity demands under the constitution of 1834. And in fact we do not understand that it is seriously denied that the power existed, until the adoption of the constitution of 1870. Now the only difference in these parts of the constitution of 1834 and 1870, in reference to the creating of courts, is this: By the constitution of 1834, "The judicial power of the State was vested in one supreme court, in such inferior

Halsey v. Gaines.

courts as the Legislature may from time to time ordain and establish, and in the judges thereof." By the Constitution of 1870, "The judicial power of this State is vested in one supreme court, and in such *circuit, chancery,* and other inferior courts as the Legislature shall from time to time ordain and establish, and in the judges thereof," etc.

The difference is, that in the Constitution of 1870, "circuit and chancery courts" are expressly named as some of the inferior courts that the Legislature may from time to time ordain and establish. It will be borne in mind that there is no clause in either Constitution, in terms or by implication, prohibiting the Legislature from abolishing any of the inferior courts after they have been once established.

We have seen that under the Constitution of 1834, it was left to the Legislature to determine how many inferior courts was necessary to meet the public demand, and to ordain and establish them accordingly, and in so doing to abolish courts previously existing and substitute others in their place, and necessarily to increase and diminish the number at pleasure.

The Legislature also had power to determine the character of the inferior courts, whether the circuit, chancery, or other courts. In this latter respect the Constitution of 1870 makes a change. Circuit and chancery courts are specified as some. of the inferior courts, to be established by the Legislature from time to time, and it may be conceded that the two systems are therein recognized, and it may be further conceded that the Legislature has no power to abolish either

system.    But was it ever supposed by the framers of
the Constitution that they were depriving the Legisla-
ture of the power to judge and determine how many
circuit and chancery courts were necessary to dispatch
the public business in the different counties of the
State?    It was known that under the previous con-
stitution the power to determine the number was left
to the Legislature, and if a change in this respect was
intended, it would have been easy to so express the
intention in unmistakable language, and surely it would
have been so expressed.

. The Constitution of 1870, while it recognizes circuit
and chancery courts as part of the inferior courts of
the State, does not recognize any particular number of
them, or specify how many of them shall exist.

But it is said that the power to dispense with one
court necessarily implies the power to dispense with
another and another until the whole system is de-
stroyed; that there is no limit and no mode by which
it can be determined how many courts may be abol-
ished, and how many shall be left.    This argument,
which is apparently plausible, is wholly unsound.

The act in question can in no sense be regarded
as an attempt to undermine either system, of circuit
or chancery courts.    The same act abolished two courts,
one circuit and one chancery court, but no different
character of inferior courts was substituted in their place.
The remaining circuit and chancery courts were deemed
sufficient.    If any county or section of the State should
be left without a circuit or chancery court having ju-
risdiction of its citizens and property, there might be

Halsey *v.* Gaines.

some room for the argument that the Legislature was attempting to abolish these courts; but in this instance there were at the time of the passage of this act, two circuit and two chancery courts in the city of Memphis, each two courts having concurrent jurisdiction over the same citizens and property, and the Judges thereof were elected by the same people, and the abolition of two of these courts left the others in full force, and in the opinion of the Legislature the two remaining courts were sufficient for the public wants. How can it be said that this was an attempt to make war upon either system?

Formerly we did not have a chancery court in every county, several of the smaller counties were consolidated into one chancery district, but the number of courts has multiplied until there is now probably one in every county. If the Legislature should determine to return to the old system and establish one chancery court for several small counties, there could be no objection to it, either in the Constitution or in sound policy—it would probably be an admissible change. Can it be said, that there is no difference in principle between the power to say that one chancery court shall transact the chancery business of two or three small counties, or that Shelby county shall have but one circuit court as other counties instead of two, and saying that there shall be no circuit or chancery courts at all? No difference between determining the number of courts necessary, and declaring they shall be abolished?

It is said that it would be impossible to distin-

21—VOL. 2.

guish between an act, merely intended to reduce the number, and an act which would in effect tend to abolish the system so far as the question of power is concerned, and therefore the power must be denied altogether ; that the power to abolish one of the circuit courts of Shelby county, implies the power to abolish them all, and leave the county without any circuit court, having jurisdiction of its persons or property. We think the distinction is very clear. After the circuit court in question was abolished, Shelby county still had a circuit court left, and in that respect was in as good condition as any other county in the State. And the business of the court abolished was transferred to another court of concurrent jurisdiction, the judge thereof being elected by the same people.

The system of circuit and chancery courts throughout the State and in every county in the State, remained as perfect and intact after the act as before, and to concede the power to the Legislature to abolish these two courts is by no means to concede the power to abolish the system in any part of the State to deprive the people of circuit and chancery courts for the trial of their causes. It is said, however, that Legislatures might reduce the number to such an extent, as to wholly fail to meet the public wants, and in this way virtually subvert the whole judicial system, and it is argued that therefore the power does not exist. This is an argument often resorted to, and no argument is more fallacious. It assumes that if the power be one, that the Legislature might abuse, and in its abuse subvert the other departments of the govern-

Halsey *v.* Gaines.

ment, therefore the power does not exist; whereas, it is certainly true that the Legislature may in many modes, in the exercise of unquestioned power, utterly ruin and destroy the government.

It is the argument on the other side of the question, that the Legislature has unlimited power in establishing courts, not only circuit and chancery, but other inferior courts. That body has, therefore, the power to establish a court in every civil district in the State, and support them by taxation, and the people could be as utterly ruined in this mode as by destroying the court. It is true that this is an extravagant supposition, but not more so than that the Legislature may reduce the number of courts so . as virtually to destroy the system. It is easy to suppose that the county may be ruined by two many courts as by too few, and what renders it worse is, that if the calamity supposed, of creating a court in every civil district, should occur, according to the argument, nothing short of a convention could get rid of them.

Under the Constitution of 1834, the Legislature certainly possessed what is now supposed to be the dangerous power, but it seems that the State lasted through the period of its existence without experiencing any of the evils now apprehended.

The truth is, the Legislature has the power, in many ways, to destroy the government. The remedy, where the Legislature attempts to exercise power it does not possess, is in the courts, but where it simply abuses power that it does possess, the remedy is with the people at the ballot box.

But it is argued that although by the foregoing construction, the Legislature may have power to abolish the courts when they become unnecessary, that the abolition of the court can only take effect at the expiration of the judge's term, otherwise we defeat that clause of the Constitution which says that the judge's term shall be eight years. If the framers of the Constitution intended to leave it to the Legislature to establish and abolish courts as the public necessities demanded, this was not qualified or limited by the clause as to the judge's term of office. To so hold, would be to allow the clause as to the length of the judge's term to overthrow the other clause, whereas we construe the provision that the judge's term shall be eight years, to be upon the assumption that the court continues to exist; otherwise we should have to hold that the court must continue, although declared unnecessary and abolished by the Legislature, simply to secure to the judge his full term and salary.

We have pursued this question to an apparently unnecessary length, for the reason that while the argument for the relator is placed upon still other grounds, we think the foregoing is really the only deliberate question. If we assume that the relator's office has been abolished in fact and in law, and that the question has been not only so adjudged but rightly adjudged, we do not think it possible to maintain that the Constitution of the State secures to the incumbent compensation during the remaining period of the term after the office had ceased to exist.

It is argued that the act abolishing the court did

not abolish the judgeship—the relator might still be judge, although his court was abolished. Our Constitution does not recognize a judgeship except as the judge is the incumbent of a court or courts which he is commissioned to hold. We have no supernumeraries, and although while he holds the office he may interchange with other judges and exercise the functions of his office in any part of the State, it can hardly be maintained that the relator has in fact continued to be a judge from the time his court was abolished until his term expired. He does not aver that he has exercised the functions of a judge, and had he done so, his acts would no doubt have been void.

The argument is further pressed upon these provisions of the constitution, relating to a judge's term of office, his salary and also the mode of his removal. These provisions in brief are, that the term of the Circuit Judge or Chancellor is eight years. He shall receive at stated times a compensation to be ascertained by law, which shall not be increased or diminished during the term for which he was elected. Speaking of these provisions, Judge Nicholson, in the opinion referred to, says: "We have not deemed it necessary to discuss the bearing upon the case of the provisions of the Constitution which provides for the salaries and term of service of the judges, for the reason that we consider it too clear for argument, that if the law abolishing the courts is valid, the offices and their incumbents necessarily cease and of course along with them their salaries." "In our own view of the Constitution,"

he continues, "the judge's right to his full term and his full salary is not dependent alone upon his good conduct, but also upon the contingency that the Legislature may, for the public good in ordaining and establishing the courts from time to time, consider his office unnecessary and abolish it. The exercise of this power of the Legislature is neither such as interferes with the independence of the judge or with his term of office or can be properly complained of." We approve and adopt this language.

The judge's term of office is eight years. The Legislature has no power to change the length of his term, either by direct or indirect legislation. His salary cannot be increased or diminished during his term, and he cannot be removed except in the manner pointed out in the Constitution, or by impeachment, but all this assumes that the office still exists. To dispense with an unnecessary court is not to change his term of judgeship, or is it to affect the guarantees of the constitution as to his salary, nor does it remove the judge from office. The office no longer exists, and of course a removal from an office that has no existence is not a conceivable proposition.

We concede the legislation which indirectly aims to legislate the judge out of his office before his constitutional term expires, under the guise of changing the circuit or otherwise, would be unconstitutional and void, such is the character of the cases referred to; but in our opinion this is a wholly different case. This is simply where two circuits existed in the same county with concurrent jurisdiction, and judges elected by the

people; one of the courts is regarded unnecessary and is abolished. These provisions of the Constitution were intended for the protection and benefit, not of the judge alone, but of the people, to secure a judiciary free as far as possible from improper influences, and therefore the term is fixed. The salary to be ascertained by law, and not increased or diminished during his term, and he cannot be indirectly removed. But the framers of the Constitution never intended to say by these provisions, that unnecessary courts should not be abolished, or if abolished, that the judges should continue to receive their compensation as before.

These provisions of the Constitution as to the duration of the judge's term and his salary, were intended to be of no higher sanctity than the other provisions. They are parts of the same Constitution under which the Legislature is expressly given the power to ordain and establish courts from time to time, and, as we have seen, to abolish them. The different parts of the Constitution are to be construed together. While the courts existed, these provisions should be enforced in favor of the judges and the people, but where the courts were abolished, to continue them in force in favor of judges after they had ceased to be judges, would, we think, violate the spirit of the organic law, and out of too tender a regard for the supposed rights of one man, injure the rights of the balance of the people.

The question at last resolves itself into this, was the relator a judge of this State from the third Monday of September, 1875, until 1st September, 1878.

That he was not, seems to us very manifest, and if not, he is not entitled to a salary.

Much has been said as to the necessity of maintaining the independence of the judiciary, especially to maintain the courts free from legislative interference. There are provisions of the Constitution intended to promote in some degree the independence, and those provisions should be upheld, but independence in fact is "a fiction of law." While the Legislature cannot rightfully subvert the judicial department, it possesses many powers against which the courts have no protection, except the integrity of the Legislature itself and the people. The taxing power belongs to the Legislature, and if that body refuses to levy the necessary taxes to support the government, the courts would be powerless.

Many authorities have been referred to, some of which we have examined, among others the case of *The Commonwealth* v. *Gamble*, 62 Pennsylvania, 342. In that case the judge was elected and commissioned for the 29th circuit, composed of the county in which he resided. The Legislature afterward undertook to transfer this county to another circuit, and to the jurisdiction of another judge, elected by a different people. The court held that this could not be done, under the Constitution of that State, not very different from ours, but Chief Justice Thompson expressly says that where the office has been abolished, there can be no incumbent; that a judge cannot exist without a court. It is not necessary that we question

the correctness of this decision, or criticise the argument of the opinion.

In the case of *The State of Missouri* v. *Draper*, 50 Mo., 355, an act of the Legislature redistricting the State and creating additional judicial circuits, changed the number of the 15th to the 29th circuit; it was composed, however, of the same counties. It was held that the judge of the 15th circuit previously elected and commissioned was not thereby displaced. To this we give our entire assent. The judge, however, said, whether by abolishing the circuit the Legislature could abolish the office, was not the question. The discussion was put mainly upon the ground that changing the number did not change or abolish the circuit.

The case of *The People* v. *Templeton*, 12 California, decides simply the term of a judge fixed by the Constitution applied to a judge elected for a new county after the general election; that the Legislature could prescribe the time of electing a judge for such new county, and when his term of office should begin, but the Constitution fixed the length of the term, and they could not be changed by the Legislature.

As to the case of *Fount* v. *Gibbs*, 54 Mississippi, 396, we will not undertake to review or criticise it. There is nothing in the reasoning to change our conclusion, and the same may be said of *The People* v. *Davis*, 28 Illinois.

While there is much in the reasoning of some of these cases boldly maintaining the integrity of the judicial department against legislative interference, they do not seem to us sufficient to authorize us to over-

Halsey v. Gaines.

rule our own decision and adjudication upon this very
case, supported, as we think it is, by the soundest
reasons.

The judgment will be reversed and the proceeding
dismissed.

FREEMAN, J., delivered the following dissenting
opinion:

On the 4th Thursday in May, 1870, at a general
election, Halsey was elected by a vote of the people
one of the judges of the 20th judicial circuit, which
embraced the county of Shelby. He was duly com-
missioned by the Governor, under the Constitution, and
according to law, as such judge, for the term of eight
years. In 1875 the Legislature passed a law abolish-
ing this particular court, known as the Second Cir-
cuit Court, and provided that the First Circuit Court
of Shelby county should, after this, be styled the Cir-
cuit Court of Shelby county. It then transferred all
the cases then pending in the second circuit court,
with the papers appertaining to them, to this one cir-
cuit court of said county, and the 4th section repealed
the act of 1869, which established this second circuit
court.

The relator has held himself in readiness to perform
the duties of the office for which he holds the com-
mission of the State, and has applied for his salary,
the payment of which is refused, hence this suit.

This case presents for the first time in our State,
in a definite form, the question, whether the Legisla-
ture has the power, by a simple act of legislation, the

Halsey *v.* Gaines.

enactment of a law, to remove a judge from his office before the expiration of his constitutional term. The question was discussed by myself as a probable result that would be sought to be deduced from the holding of a majority of the court in a case growing out of the act repealing the act establishing this court some years since.

But the question as it now stands was not before us for adjudication, and was not adjudged in that case. It is an open question, and one upon which this court is called on for the first time to lay down the rule which is to guide the future legislation of the State on this vitally interesting question.

It certainly behooves us to give such a construction of the provisions of our Constitution affecting the judiciary department of the government as shall tend best to conserve and preserve the great essential elements of independence and impartiality that have always been recognized as worthy of all care in every system of free constitutional government. In view of this I hold that if two constructions of our Constitution, equally plausible (if such a case were possible), could be made, the one tending to weaken the independence and impartiality of our courts, and the other tending to strengthen these elements, the imperative duty of the court would be to adopt the latter. This not only as a matter of sound judicial policy, but in accord with all the teachings, traditions, and spirit of the system of jurisprudence under which we live, as well as the axiomatic governmental maxims of this, as well as the courts from which we derive all the lead-

ing principles of public liberty embodied in our Constitution, State and Federal. Any construction that departs from this view, unless imperatively demanded by the language of the Constitution, must be essentially vicious.

The provisions of our Constitution are few and simple on this question, and are found in the several sections included in article 6, entitled "Judicial Department," with the addition of section 5, article 7 providing that the election for judicial officers shall be held on the first Thursday next preceding the expiration of their respective terms, the first election being directed on that day in the year 1870.

The first section simply provides for the distribution of the judicial power. It is as follows: "The judicial power of this State shall be vested in one supreme court, and in such circuit, chancery, and other inferior courts as the Legislature shall from time to time ordain and establish," etc. Section 4 is, that judges of the circuit and chancery courts, and other inferior courts, shall be elected by the qualified voters of the district to which they are to be assigned. Every judge of such courts shall be thirty years of age, and shall, before his election, have been a resident of the State for five years, and of the circuit or district for one year. "His term of service shall be eight years."

The other clause of the Constitution specifically pointing out the modes by which a judge may be removed by the Legislature, we will refer to hereafter.

For the present we take section 1 and section 4, above cited, and endeavor to ascertain the result as

Halsey *v.* Gaines.

bearing on the power of removal of a judge by the Legislature under them. The argument in favor of the power to vacate the office of a judge by repeal of his circuit, or the act creating his court, rests probably solely on the language of the first section, "such circuit, chancery, and other inferior courts as the Legislature shall from time to time ordain and establish." Take this language alone, without reference to the other provisions of the instrument, and it might be held that the Legislature had the power to establish such circuit and chancery courts as the public services demand, and it might also be insisted that it might diminish these courts for the like reason.

Strictly following the language used, however, and it only refers to and confers on the Legislature the power to establish courts, that is, that a court shall be holden at this place or that, as in the city of Memphis, and at another place in same county, Bartlett, as has been done. It certainly does not define or profess to fix or limit the term of office of the judges that may hold such courts. The difference between courts and the judges who hold them is recognized by the next clause of the sentence recognizing the judicial power as being in these courts, and in the judges thereof and justices of the peace." No inference certainly can be drawn as to the term of office of these latter officers from this language. In fact this is left to be fixed, and is fixed in both cases, by other independent provisions specifically regulating this particular subject. We might concede that if nothing else was found in the Constitution we might

fairly act on the inference to be drawn from the clause quoted, and hold that when a court is established by the Legislature, a judge was necessarily implied, whose term should be commensurate with the existence of such court, and whose office should cease when the court demanding his existence was abolished or ceased to exist. All this may be very well as in inference from this language. It would be but an inference, however, a legitimate one it may be, but still only an inference drawn from this language standing alone.

The question, however, is, whether this mere inference, drawn from a clause that does not, in direct terms, nor even profess to be designed to fix the term of service of these judges, shall control and overrule other clauses that do, in plain and unmistakable terms, fix and limit their term of service? I am unable to see the principle on which an inference which we might draw in such a case, there being no specific regulation of the question, shall be precisely as operative and forcible when we find such regulation as when we do not, and that such an inference is to have the force not only to qualify the express terms of the Constitution when regulating the very subject, but to render them entirely inoperative and of no effect whatever in certain cases, at the option of the Legislature. I am totally at a loss to conceive of any canon or rule of constitutional construction on which this theory can rest. I have always understood that an inference must yield to a plainly expressed purpose, and that an expression of one thing

in a constitution was the exclusion and prohibition of another and different thing contrary to it. Says Judge Catron, whenever a State Constitution prescribes a particular mode in which power shall be executed, it prohibits every other mode; an attempt to render it nugatory by law would be an attempt to repeal it. These principles seem so necessary and so inherent in the philosophy of the question that I cannot see how they can be questioned. The opposite rule leaves us to infer a result from a single clause or the language of a section on one subject that renders nugatory, it may be, the express provisions of another in which the precise subject is provided for and regulated. May we not reply that the Convention could not provide for every thing in the same clause, therefore it is but fair to look at all they have done or said on the subject to ascertain what was designed, and that the inference, if contrary to what they have said in another part of the instrument, is certainly not equal to an imperative constitutional mandate? I think this is a sound answer to the view combated. Again, if the expression of one thing is not the exclusion of another and different thing, then we have two constitutions or rules on such questions parallel the one with the other, and equally regulating the same subject, one the written Constitution, its express provisions, the other whatever the Legislature may choose to adopt as a mode of regulating the particular subject. It is at once seen that this would subvert the constitutional government, and result in such infinite confusion as to demonstrate its unsoundness as a rule of constitutional

exposition. Let us now apply these principles to the question in hand.

By section 4 judges are to be elected by the voters of their district or circuit. This involves the idea of pre-existence of the district or circuit. These are established by the Legislature. This is an inferential power, because not expressly given in words. In view of our long established system, in existence at the time of the adoption of the Constitution, it is well understood.

We come to the term of the service. How long shall he hold his office, or what is the term of service of such judge when he is elected, to be assigned, or preside over such district? The language is, "His term of service shall be eight years." When we seek to know the term of service, this is the clause we must look to, because it is the one in which the Convention has specifically given expression to its purpose on this subject. Inferences may be drawn from the other parts of the instrument, but there is no room for any here. The language is so plain that it can have but one meaning. We have in this clause a specific and prescribed term fixed for the service of such judges as are to be elected in the respective circuits, in whom is placed the judicial power by the first section of the article. . In the first section, which simply distributes the judicial power, we have nothing expressed on this subject but language from which an inference might be drawn.

In the fourth section we have the precise regulation expressed as to the term of his office. The

question is, which shall prevail, the inference thus drawn, or the clear and express language of the section that was intended and did fix the period of service. This is a clear expression of one thing, and must necessarily exclude its opposite, and all inference drawn from other clauses contrary to it must yield, or the plain principle that a clearly expressed purpose must control any inference whatever to the contrary. To make this clear, let us state the substance of the first and fourth sections together. In the first the judicial power is distributed, that is, the courts established and the power confided to them and the judges thereof, then add to this clause, and such judges shall hold the office for the term of eight years. Would any man ever dream of reading this, that this term could be shortened, or made less by any power short of that which made the Constitution? I think not, that is, with no apparent necessity for a different construction. We can see how a different theory is conceived. The Legislature passes a law that does so in obedience to an assumed expediency. Then the natural feeling is to try and sustain the act of this body, and so we go to work to find reasons why it may be done, and as in this case, by some ingenuity we can do so. But as I think it is done by disregarding for the first time principles of construction that have been laid down by this and all other courts as axioms, and at all times acted on heretofore. For instance, as said in the case of *Normant* v. *Smith*, 5 Yer., 271, that whenever a State Constitution affirmatively prescribes a particular thing, that amounts to a

22—VOL. 2.

prohibition of the opposite. If this is a sound rule, then we disregard it in order to support this holding, because the Constitution says the term shall be eight years, the holding is that the Legislature may make it four by indirection. The Constitution says how a judge shall be removed; this holding is that he may as well be removed by different modes, regardless of and different from what the Constitution has prescribed. Is it the judiciary alone, the department that should be thus alone the subject where this rule of Judge Catron should not be applied? If so, why? If the two clauses of the Constitution are both to be effective, as all conceive in theory must be the case, then the fair construction is that the Legislature establishes districts or circuits when needed, provides for the election of a judge to whom said circuit is assigned, the Governor commissions him for eight years, and the Constitution fixes his term of service for the same period, no longer, and no power can make it less, except in the mode pointed out in that instrument. This is true unless we assume there is power in the Legislature either to dispense with or override the Constitution, a proposition that no one maintains. This view reconciles these clauses, prevents all conflict or antagonism between them. The other makes the one virtually overrule the other, and the one that is thus made to control, says nothing on the subject whatever —does not and was not intended to regulate it in any way.

Suppose the purpose had been to give the power now claimed, the Constitution would have read, the

term of service shall be eight years unless the Legis-
lature deem it best to abolish the circuit or court over
which said judge is assigned or elected to preside.
These words would have met the case precisely, and
have prevented all difficulty on the question.    They
would, however, have been a most material addition
to and change of the clauses under consideration.    Does
not the view taken in favor of defendant in this case
of necessity involve the addition of these words or
their substance to the Constitution, contrary to its
plain and unmistakable provision that the term shall
be eight years?    Again, if the Legislature can lessen
the length of the term of service by indirection, may
they not equally do so directly by specific enactment,
that the judges of certain circuit courts, when estab-
lished, shall only hold office five years, as in this case
was the fact if Judge Halsey ceased to be a judge
when his court was abolished?    Will it be maintained
that the Legislature has the conssitutional power to
do indirectly without saying so, or purporting to do
so, what they cannot do directly, and by expressly
saying it is so intended?    Yet this is the ineritable
result, and the principle on which the power now
claimed must rest.

If the Legislature can cut the term of service
down to five years by indirection, it seems to me
they would equally have the power to prescribe that
as the length of the term in advance.    If not, I ask
why not?    It is because the Constitution says it shall
be eight years.    But if it can be shortened by indi-
rection, as is claimed in the way done in this case,

what is the use of the requirement of the Constitution fixing eight years as the length of his term? You cannot enact that it shall be four or five years in advance,, but you can enact the same thing after commission issues to the judge for the constitutional term.    This may be sound law, but to me it is strange logic.

It is argued that in the theory maintained there may be a judge without a court, and this probably is the strong point made against it.    Possibly there might be such a case, but we may assume that the Legislature will not be guilty of such folly.    But conceding for the argument that they have the power to make it so, practically it is a very slight consideration on which to maintain the opposite view.

We must assume that no circuit would be created by the Legislature unless demanded by the wants of the people at the time—a real and probably permanent want.    In our country, in its ordinary normal state of development and growth, our population is steadily increasing.    The business of the country, as a whole, is likewise steadily increasing, as evidenced by the difference between our now overcrowded docket in this court, and the state of those dockets before the war.    The increase, I believe, in the last fifteen years, has been at least tenfold, or nearly so.    It is true that increase may be checked at times, as it has been in the last three or four years, by interruption in the business of the country by causes familiar to all.    Still the general current is always, and will continue to be for generations, toward a definite and

steady increase of business in our courts, consequent on increased population and increased trading with increased and varied industries adding to the number and variety of contracts to be made by our people in their legitimate callings.

It is not probable, scarcely possible in this state of things, that there shall be an urgent demand in fact for the abolition of any circuit or court which has been or may be established to serve a real want of the people of the district where such court may be established. If this be true, then, practically, and in view of the facts, there is next to no danger of any wrong being done of a serious character by allowing the continued existence of a court for the constitutional period prescribed for the term of our judges, a real necessity for the abolition of a court established when needed, can only be predicated of some locality where, instead of progress, there shall be a decline both in population and business, a thing not probable in any portion of our country in the future as the general rule, which may find exceptions, but they must, in the nature of things, be rare, grow out of an abnormal state of things that does not demand the Constitution shall be strained or the plain requirements overridden to meet them.

I might say, in reply to the argument, that many things might be done by the Legislature as possibilities which would be equally as absurd as to have a judge without a court. They might repeal all the judicial circuits of the State just before an election, and all laws providing for elections of circuit judges,

and thus subvert our constitutional system, and the
same may be the case as to the chancery district.
But this furnishes no ground on which we can safely
insist on giving them power to do what the Constitu-
tion has plainly said shall not be done, that is, make
a judge's term less than the period of eight years.
In addition to these provisions of the Constitution al-
ready cited, the seventh section of the same article
fixing the salary of the judge, or rather that they
shall receive a compensation for their services, to be
ascertained by law, which shall not be increased or
diminished during the time for which they are elected.
If there was nothing else in the Constitution on the
subject except the first article establishing these courts,
and then a statute only on our statute books prescrib-
ing the term for which the judges should be elected.
with this last clause of the Constitution, I would be
inclined to hold that this state of things forbade the
Legislature from taking the entire salary by running
the officer from office. He would be elected for eight
years by law. The Constitution says his compensa-
tion is to be fixed by law, and shall not be increased
or diminished during the term for which he is elected.
The time for which he would be elected would be
eight years, under such a state of the Constitution and
laws, and inevitably it would follow the salary must
be paid for this time, and all of it as fixed when
the election took place, and that until that time has
expired. If this is not the necessary result, I con-
fess I am unable to see the reason why. It must
be so unless we say that while the Legislature cannot

diminish the salary or make it less during this time, it may take it all away. They may not take half, but the whole is subject to their control, and they may say it shall not be paid, nothwithstanding the Constitution says it shall be, and that without diminution. A construction involving such contradictions surely cannot be sound.

Again, if this compensation can be taken away by this process, after the judge is elected and commissioned for eight years, then it may be prescribed affirmatively and directly, the next year or even week after the judge is elected, that the judge or judges shall receive no salary after a certain day, and this must be held a valid exercise of power, unless it be held the Legislature cannot do by saying so in plain language what they can do by not saying so, but by legislating only partially on the question. The Constitution, it is said, did not contemplate that there could be a judge without a court, and this may be conceded. Therefore it may be assumed the Legislature will not create this state of things, certainly ought not to be allowed to do so, and so I maintain they cannot rightfully do so.

I have conceded for the argument that it was possible there might be a judge without a court or circuit. But I hold on a fair construction of the Constitution this cannot be, a court or circuit involves of necessity as a correlate a judge for said court or circuit. The Constitution has fixed the term of such a judge at eight years. When a circuit or court is created, therefore it must be that the circuit or court

substantially must remain for the period fixed, and this
obedience to the implication that one cannot rightfully
be without the other, and the time which the judge
shall serve is definitely fixed, and this fixes also the
time in which the court shall exist. As a matter of
course the Legislature may change the territory over
which the judge is to preside to meet public needs,
but not so as to abridge the term of the judge or
abolish his court or circuit entirely, so as to violate
the rule that there must be a court or circuit for
each judge of the State. This view meets the diffi-
culty and leaves the express mandate of the Constitu-
tion to stand, that the judge shall hold his office for
eight years. The term of service, however, is fixed
as plain as words can be made to express it, at eight
years. Does it contemplate that the Legislature may
make the term less by a legislative act? If so, I
ask, point out the provision that says so, unless it
can be done in plain terms, the one plainly expressed
purpose must be supreme and imperative.

But we turn now to a correlative view, that seems
to me to make the position maintained still stronger.
The Constitution has affirmatively and clearly prescribed
how the Legislature may remove a judge from his
office. There are two modes prescribed, and they are
for causes, such causes as include every possible ground
that can exist for his removal, by direct action of
that body. The same article of the Constitution that
regulates this entire subject of the judiciary, says how
they may be removed. One of these modes is con-
tained in section six, which provides that judges and

attorneys for the State may be removed from office by a concurrent vote of both houses of the General Assembly, each house voting separately, but two-thirds of the members to which each house may be entitled must concur in such vote. The vote shall be determined by ayes and noes, and the names of the members voting for or against the judge or attorney for the State, together with the causes of removal, shall be entered on the journal of each house respectively. It then provides that before the party is proceeded against in this way he shall have notice of the proceeding, with the cause alleged for removal, at least ten days before either house shall act thereon.

This is the mode of removal provided by the Constitution for the Legislature. Mark, it is removal, not disqualification for crime in official capacity after conviction on trial, as in the case of impeachment. Here, then, is a mode of action expressly provided for removal, carefully guarded with such limitations and instructions as shows the anxiety of the Convention to shield and protect these officers from wrongful interference with their official lives, and with like provisions for giving ample opportunity to defend against the attack by requiring at least ten days' notice of such intended action, with a statement of the causes assigned for such removal.

This section clearly provides for the removal of a judge by the Legislature in the mode pointed out, when proper cause exists for such removal simply, without crime requiring disqualification in the judgment of the Legislature, as is required in the case of

impeachment.    Every conceivable or possible proper
cause for removal is here provided for in a mode at
once fair and just to the party to be deprived of his
office, with the opportunity for explanation or defense
against the alleged cause for such action.    But when
the case is made out, still he cannot be removed by
an ordinary vote of a majority of each house, as other
acts may be passed, a two-thirds vote of each and
of all the members to which each house is entitled,
is required, and each member is to record his name,
in this way showing how he voted, so as to fix the
responsibility definitely upon him for his vote.    I
would ask if these requirements are not complied with,
that is, if the record failed to show a two-third vote
as required, a vote by ayes and noes, or in fact the
judge was not notified for the cause of such action,
or the cause is not entered on the journal of each
house, would not such an act be a nullity?    It cer-
tainly would, unless we could find somewhere a power
to dispense with a plain requirement of the Constitu-
tion.

If this be so, then on what principle can it be
held that this same body may remove by a simple
enactment, for no cause assigned, passed by a majority
of the body, complying in a word with no require-
ment of the Constitution, and not even purporting to
do so?    How such a conclusion can be reached is
beyond my ability to understand.    It can only stand
on the ground that if the Legislature, if it chooses to
comply with the constitutional requirement as to re-
movals, may do so, and if it chooses to take another

and different course it may do so as well, and its action be equally as effective and valid. If not this, it involves the proposition that if they propose to obey and pursue the Constitution in such a case, they must comply with its requirements; but if they choose, they may take a different course, remove by a simple act of legislation, and that by indirection, and that takes them out of the sphere of all constitutional limitation or restraint.

One other mode is provided for removal of a judge, that is by impeachment for crime committed in his official character, where disqualification to fill any office is affixed as a penalty in addition to removal. In both sections the word removal from office is used, showing definitely that this very matter and no other is being here regulated, and the mode of effecting it by the Legislature definitely settled. If that body can do the same thing by any other mode or modes that may be devised, then all these constitutional requirements are so much useless verbiage, having no practical force or operation whatever, except at the option of the Legislature, and this renders the Legislature supreme and the Constitution subordinate. To this conclusion I cannot assent, nor to any rule or course of reasoning tending to such result. The mandate of the Constitution is supreme, and all else must bend to it.

To conclude this feature of the discussion, here are two constitutional modes of action prescribed for the Legislature. I hold that no other means for attaining the purpose are allowed or can be exercised.

Yer., 271, 273. By these two modes a judge can be removed for every conceivable proper cause of removal that can be presented as the ground of action, without crime, for any proper cause, by the required vote of both houses for crime in official capacity, by impeachment with disqualification in the future.

These being the modes of removal for all proper causes, is it in accord with any principle of constitutional construction, of sound reason, or public policy, that the Legislature should be authorized to remove for any improper cause, or one not justifying removal under either of these provisions? If it be a proper one, a constitutional or legal ground, these provisions meet such a case; any other power or mode can only be rendered when he is removed for other and different causes not sufficient to attain the end under the Constitution. Is it desirable that such a power shall exist, that is, to remove a judge for less than for such causes as could be shown sufficient on notice to the party affected? I think not. It leaves the judges of these courts nominally protected by the Constitution in the two modes therein pointed out, but in fact with no protection whatever from attack and removal, and that with or without a cause, at the option of the Legislature. As I see it, the result is that the careful protection given the judge by that instrument is swept away at once, and from this on he is at the will of the Legislature, has no tenure of office, except in name, secured to him, while in fact he holds by the sufferance of the Legislature. It seems to me that in this view it is less than idle to

prescribe a fixed term of office, if for any cause the officer may have that term reduced, or be deprived of his position by a simple act of the Legislature. The independence of these judges; a theme on which jurists, judges, and statesmen have descanted in such terms of eloquence, and as I had thought, of weight and wisdom, after all must yield to the supposed or assumed notion that his service can be dispensed with for the time, and so by abolishing his court he is quietly removed from his high place and his election by the people, and his commission by the authority of the State, and his constitutional guaranty for eight years' service and salary, for which he left, it may be, a profitable practice, now possessed by others, all these are to go for nothing. He must step down and out in spite of all these, whenever a popular wave sets in for economy, or whenever he shall dare, in discharge of his high functions, offend the partisan or demagogue of influence who may chance to find his way to the Legislature from his district.

Judges are but men, and may be expected to bend, when subjected to such influence. In time it will be seen, I fear, that in many cases, if he does not bend, he will be made to fall, and be degraded from his high place, that one more supple shall wear the ermine who will do the behest of his masters. These are not the times, nor do I ever expect to see the time, when such a blow should be struck at the independence of that body in whose hands rest the life, liberty, and property of our people for protection and safety.

I have not cited decisions from the courts of other States in support of my views. I have examined a large number familiar to the profession, and I know that the almost unbroken current of judicial sentiment and decision accord with the view I have sought to maintain. I refer to *People* v. *Templeton*, 12 Cal., 401; *Westbrook* v. *Roseborough*, 14 Cal., 187; *Fant* v. *Gibbs*, 54 Miss., 403; 50 Mo., 355; 23 Ill., 550; 14 Wis., 163; 62 Pa., 345; 10 Ind., 101, and might cite other cases. It is true these cases are not authority as controlling our decisions, but opinions of such a number of able and intelligent courts are always held most persuasive evidence of what the law is. We so hold in all other cases. It seems to me there is no good reason why the same rule should not hold good on such a question as this. It is true there may be pointed out in some or most of these cases shades of difference in the facts on which the opinions were expressed, that may in some degree distinguish the particular cases from the one now before us, but the fact, I think, is unquestioned, that the whole weight and volume of these opinions, with their reasoning, is in support of the conclusion at which I have arrived. To me it seems this much of authority and judicial reasoning and sentiment should not be disregarded in order to reach the result that not only brings the judiciary of the State in the dust before the will of the Legislature itself, but makes it the reflection of the ever-shifting waves of popular political opinion, that drifts to-day in one direction, to-morrow in another, as the breath of party or its exigencies may seem to demand.

Under the holding of my brethren in this case the Legislature can remove, by indirection, every circuit judge and chancellor in the State whenever it chooses, the commission of the Governor, and the provision of the Constitution, that he shall be a judge for eight years, only means provided the Legislature chooses to permit it. For the future, whether they will permit, in many cases, I fear, will depend upon obedience and subservience to influence that will not serve to elevate or dignify the men who are called on to fill these places. All this and more, as I see it, follows as the result of such concession of power. Against such results, or any thing and every thing that tends in that direction, I can but enter my most sincere and solemn protest.

Since writing the above I have seen the opinion of the majority of the court, prepared by Judge Mc-Farland. In it I find two propositions which I think proper to notice in order to a complete discussion of this vitally important question. He says, "To dispense with an unnecessary court is not to change the term of judgeship, or is it to affect the guarantees of the Constitution as to his salary, nor does it remove the judge from his office." I am unable to see the logic of this conclusion. As the whole opinion holds the judge ceased to be a judge by repeal of the law creating the Second Circuit Court, therefore Judge Halsey was not entitled to his salary. Now if the repeal of the law did not remove him from his office, I would like very much to know what did. He held a commission for eight years, would have been a

judge for that period by virtue of it, his term was so fixed by the Constitution, his salary was to be paid during the time for which he was elected. He ceases to be a judge at passage of the law, his term is cut down from eight years to something over four years, and he is held not entitled to his salary for the balance of the time for which he is elected. If this does not change the term of judgeship, then it must be made out on the assumption either that four years is the same thing as eight, or that when the term of a judge is fixed at eight years to reduce it to four is no change. It may not be to effect the guaranty of the Constitution that his term shall be eight years, and he shall receive his salary during the time for which he is elected, but I hardly think any one who reads the majority of the court will so understand it, when he is totally deprived of his salary for the last four years of the term for which he is elected. Certain it is that Judge Halsey will find much difficulty in appreciating the force of this logic, and as a plain man he may well be bewildered by it. It is adjudged his term of office is not changed, his salary not affected, and then added, he is not removed. I think I may well ask, and wait for an answer, What, in the name of reason and law, was done, if he was not removed from office? The reason given, however, for these assumptions, is certainly one I am unable to see the force of as yet. It is, "the office no longer exists, and of course a removal from an office that has ·no existence is not a conceivable proposition." Of course not. But can we fail to see the fallacy

Halsey *v.* Gaines.

that underlies this reasoning. It is predicated on the idea that the repeal of the law creating the court, not the office, is one thing, the removal of the judge another. But the fact is, on the assumption and theory of the opinion, the repeal of the law establishing the court, removed *ipso facto* the officer. But to look at it a moment further. The office has no existence, says the learned judge, therefore there can be no removal. It had existence, however, when the act was passed which is held to have vacated it, and therefore he was removed by the act, or else he is a judge yet. When did the judge cease to be a judge? When the repeal took effect. Yet he was not removed by the law. I suppose the judge must be held to have simply dropped out of his place, which would probably more accurately express the result on this course of reasoning than anything else I can conceive in reference to such a view. The amount of it is, to put it in plain English, the office or court was repealed, and the judge who was that day a judge from thenceforward ceases to be one, under the view of the majority. If this is not removing him from office it is, to say the least of it, marvelously like it. I would be glad to see my brethren point out the difference between the two things, removal of a judge and what is held to have been done. I may more literally state what was done in this view by saying the office was removed from the judge. The other proposition is, "we concede that Legislation which indirectly aims to legislate the judge out of his office before his constitutional term expires, under the guise

of changing the circuit, or otherwise, would be unconstitutional and void." He then goes on to say this is wholly a different case, only a dispensing with one of two circuit courts in the same county, etc.

The difference between the case assumed as unconstitutional, and the case before us, is not pointed out, and I venture to say never can be by any clearer process than simply to say so. The Legislature cannot remove a judge during his term of office by a law indirectly aiming at that end, under the guise of repealing his court or circuit. This would be unconstitutional, says Judge McFarland. Now what is the form of removal here? It is certainly by indirection, for the act does not purport nor hint at removal of the judge. The effect, as an indirect result, was, as held, to remove him. Was this by direction or indirection? Certainly not directly, for that would have been to say so. It must be by indirection then, unless there is some intermediate idea between the two modes of doing the thing which will not be claimed. He was not removed, then, upon the open avowed motive of legislating him out of office. He was removed, however. How? Under the guise of repealing his court, and no how else, and so if the conceded principle is to have any sequence at all, it is that being removed by indirection, under guise of change of circuit, it is void. This is the inevitable conclusion, or else an unconstitutional act is valid. The concession and the opinion cannot be made to stand together by any ingenuity or logic. I need hardly say that what is implied by saying the Legislature cannot do this by

indirection, can or may be done by direction, would not be asserted by the learned judge, and the implication fairly deducible from the statement, was probably not observed.

But an objection lies to the proposition that it goes on the assumption that this or any other court can test the constitutionality of an act of the Legislature by looking at the motives of that body. If the real purpose is hid under the guise of doing another, then it is unconstitutional. This is the principle asserted, this a supervisory power in this court never before asserted, that is to look into the motives of the body, and from these say whether the law passed is constitutional or not. When my brethren come to apply the principle in the future to the action of the Legislature, it will be an interesting problem for them to solve, what is a proper motive or guise under which an act of the Legislature shall be passed. One man votes for the bill to aid the success of his party, another, it may be, is bribed, another because his particular constituency may be benefited, regardless of the general good of other portions of the State.

How much of this wrong motive will it take to make the law unconstitutional? By what rule are we to be guided in ascertaining what shall be the proper "guise" under which a law can be held valid? All these and many more very interesting questions will have to be solved if the rule is to be made practical. If not for use, it will hardly serve any good end to announce it as part of our constitutional jurisprudence.

I need but refer to the opinion and reasoning of Chief Justice Marshall in the celebrated case of *Fletcher* v. *Peck*, 6 Cr., 87, adopted and approved by this court in opinion of Judge McKinney, as a complete authoritative answer to such a view. The principle has no foundation in the reason of our law, and is so erroneous in principles that it will never be seriously contended for.

I conclude with a quotation from Chief Justice Thompson, of Pennsylvania, in the cause of *Commonwealth* v. *Gamble*, 62 Pa. He says: "What would be more destructive to all independence of action of a judge than the momentary liability, during the recurring sessions of the Legislature, to be dismissed from the exercise of the functions of his office by the repeal or abolition of his judicial district? If all the while he is conscious that he exercises the powers and authority conferred by his commission only by the forbearance of the Legislature, although it might be possible that independence of action might still exist, it would be an exception as a rule, it would be a myth. Such a state of things as would follow a rule affirming the constitutionality of the act in question, would be utterly subversive of the independence of the judiciary, and distinctive of it as a co-ordinate branch of the government. Establish this power in the Legislature, and it will be as easy as it is common, for powerful corporations and influential citizens to move the Legislature to repeal districts and supersede judges who may not be agreeable to their wishes and interests, and transfer their business to other ju-

risdictions supposed to be more favorably inclined. This mode would be destructive of all that is valuable in the judicial office, and preservative alone of those evil qualities which flow from a subverted and subservient judiciary. If there were no special reasons for holding it unconstitutional, these general views would require it to be so held."

While it may be the dangers thus depicted are not yet to their full extent to be realized among us, yet many of them will sooner or later be seen, and the future will but tend to increase them. In view of this sound public policy, as well as prudent forecast against threatened danger, demand a strict and stern adherence to all the conservative provisions of our Constitution that serve to guard the purity as well as support, maintain, and uphold the independence of that department of our government, that in theory, at least, is supposed to stand outside of and beyond all popular influences, and is required to "hold aloft the scales of justice," and give out her mandates with fearless impartiality, unawed by the popular voice, and even in defiance of its wildest cry, when law and eternal right shall call to the performance of such a duty.

For these reasons I respectfully but earnestly dissent from the opinion of the court in this case.